Argued and submitted September 9, reversed and
remanded December 1, 1981, reconsideration denied January 14,
petition for review denied February 10, 1982 (292 Or 568)

## THEMINS,
*Appellant,*

*v.*

## EMANUEL LUTHERAN CHARITY BOARD et al,
*Respondents.*

### (No. A7906-02685, CA A20072)

637 P2d 155

Elden M. Rosenthal, Portland, argued the cause for appellant. With him on the briefs were Rosenthal & Greene, P.C., and Charles Paulson, P.C., Portland.

Robert M. Keating, Portland, argued the cause for respondent Emanuel Lutheran Charity Board. On the brief were William L. Hallmark, and Lang, Klein, Wolf, Smith, Griffith & Hallmark, Portland.

Christine L. Dickey, Assistant Attorney General, Salem, argued the cause for respondent Dr. Jonathan Hoppert. With her on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, Joseph, Chief Judge, and Van Hoomissen, Judge.

JOSEPH, C. J.

### JOSEPH, C. J.

This is a medical malpractice case in which plaintiff seeks damages from Dr. Hoppert and Emanuel Lutheran Charity Board, doing business as Emanuel Hospital (Emanuel).[1] On June 10, 1977, plaintiff suffered an injury to his right foot. He was taken to Emanuel, where he was examined by Dr. Herdener and Dr. Perry. He was then seen by Dr. Hoppert, who was serving as an orthopedic resident on a rotation from the University of Oregon Health Sciences Center. Plaintiff alleged that his foot was improperly wrapped and that, due to excessively tight bandages and wrappings, the circulation to his foot was cut off, which led to tissue death and amputation.

Summary judgment was granted in defendant Hoppert's favor, based on his affidavit that he was a state employee and was not given written notice of the claim within 180 days of the alleged tortious conduct as required by the Oregon Tort Claims Act.[2] Partial summary judgment was thereafter granted in Emanuel's favor on the issue of its liability for any negligence of Hoppert.

Plaintiff appeals the final judgment entered after both motions for summary judgment were granted.[3] Both defendants had the burden of proving that there was no genuine issue of material fact and that each was entitled to judgment as a matter of law. ORCP 47C; *Stanfield v. Laccoarce,* 288 Or 659, 607 P2d 177 (1980); *Seeborg v. General Motors Corp.,* 284 Or 695, 588 P2d 1100 (1978).

With respect to Dr. Hoppert's summary judgment, plaintiff correctly points out that the version of the Oregon Tort Claims Act in effect at the time of the alleged malpractice (June 10 through June 13, 1977) did not require giving notice as a condition precedent to suing an individual state employee or agent. ORS 30.275(1) (1975); *Smith v. Pernoll,* 291 Or 67, 628 P2d 729 (1981). Even if Hoppert

---

[1] Plaintiff originally joined Dr. Perry as a defendant; his motion for summary judgment was granted, and plaintiff does not assert that as error on appeal.

[2] ORS 30.275.

[3] Final judgment was entered in Emanuel's favor after the granting of Dr. Perry's summary judgment, which is not in issue here.

was a state employe at the time of the alleged malpractice, notice was not required, and it was error to grant summary judgment in his favor.[4]

In its motion for partial summary judgment, Emanuel argued that Hoppert was not an agent or employe of the hospital but of the University of Oregon Health Sciences Center. Alternatively, it argued that if Hoppert were found to be an agent of the hospital, plaintiff's failure to allege giving a tort claim notice, to which it was allegedly entitled as a public body, precluded recovery as a matter of law. The court did not specify upon which ground Emanuel's motion was granted. We will therefore explore each.[5]

## TORT CLAIM NOTICE

ORS 30.260, at the time of the alleged malpractice, defined "public body" as

> "* * * the state and any department, agency, board or commission of the state, any city, county, school district or other political subdivision or municipal or public corporation and *any instrumentality* thereof." (Emphasis supplied.)

ORS 30.275(1) required that

> "[e]very person who claims damages from a public body for or on account of any loss or injury within the scope of ORS 30.260 to 30.300 shall cause to be presented to the public body within 180 days after the alleged loss or injury a written notice stating the time, place and circumstances thereof, and the amount of compensation or other relief demanded. * * *"

---

[4] Because of the way we resolve this case, we need not decide whether Dr. Hoppert was a state employe at the time of the alleged malpractice. ORS 30.268 now determines when medical treatment by University of Oregon Health Sciences Center faculty, staff and students at facilities other than the Center is within the scope of state employment, but the statute was not in effect at the time of the alleged malpractice here.

[5] Emanuel argues that the judgment should be affirmed because plaintiff failed to produce any evidence of negligence or causation in response to its motion for summary judgment. However, Emanuel's argument in support of its motion for partial summary judgment raised only the question of the necessity of giving a tort claim notice to Dr. Hoppert and Emanuel. It made no argument that plaintiff failed to prove negligence or causation and produced no evidence controverting plaintiff's allegations of negligence with respect to Dr. Hoppert.

■      Emanuel is a private, non-profit corporation in the business of providing hospital services. It nonetheless contends that it was an "instrumentality" of the state and, therefore, a "public body" entitled to notice by virtue of its contractual arrangement with the University of Oregon Health Sciences Center. As part of its resident training program for medical school resident doctors and to "provide a variety of structured learning experiences," contracted with Emanuel for the latter to

> "* * * provide an opportunity for the House Officer [resident doctor] to have a satisfactory training experience in accordance with applicable provisions of the AMA directory of Approved Residencies."

Emanuel agreed to pay the Center the salaries of the "House Officers" plus 15 percent to cover the Center's costs for fringe benefits and taxes associated with the employment. The Center agreed to assign doctors on a rotating basis, to pay their salaries and to provide malpractice insurance coverage for the doctors "at all times while acting within the scope of their employment or duties on behalf of the Center." According to Emanuel, because it was "the means through which the [Center's] teaching program was accomplished," it was an instrumentality of the state.

As plaintiff points out,

> "Emanuel contracted with the State of Oregon to provide a training opportunity for its resident doctors. The state of Oregon did not contract with Emanuel to provide medical services to the community. The purpose of the contract was to provide on-the-job educational opportunities."

If Emanuel were to be treated as an instrumentality of the state at all, it would be for the purpose of providing medical education to the Center's resident graduates, rather than for the purpose of providing medical services to the public. The fact that Emanuel's use of the resident graduates was for the purpose of providing medical services to the community did not convert the medical school's purpose into one of providing such services. Moreover, without any evidence that the medical school had any involvement in the operations of Emanuel with respect to the practice of medicine by its "House Officers" or their on-the-job training, it cannot

be said that Emanuel was the instrumentality of the state for *any* purpose.[6] Hoppert's relationship with Emanuel was no different than with any other residents with respect to the practice of medicine.

We hold that Emanuel is not a "public body" within the meaning of ORS 30.260, and so the failure to give a tort claim notice was not fatal to plaintiff's action against the hospital.

## VICARIOUS LIABILITY

In his memorandum of law in support of his motion for summary judgment, Dr. Hoppert contended that at the time of plaintiff's treatment he was employed by the State of Oregon as a resident in orthopedics at the University of Oregon Health Sciences Center and that any treatment he performed was done as a house officer and resident at the Center while he was serving as a state employe on rotation at Emanuel. In his affidavit in support of his motion for reconsideration, plaintiff stated:

> "* * * [O]n or about June 10, 1977, I fell a distance of 15 to 20 feet and landed on my feet. I was taken to Emanuel Hospital where I was first seen by a doctor in the emergency room, and then a doctor came in that I assumed was working for Emanuel Hospital; my right foot and ankle was not causing me pain until it was tightly wrapped by a Dr. Hoppert with an Ace bandage; that I thought Dr. Hoppert was working for Emanuel Hospital; I would not have let Dr. Hoppert or any trainee wrap my foot and ankle if I had known that he was not an employee of Emanuel Hospital, or if I had been told he was a resident on loan from the Medical School and was not a fully qualified orthopedic specialist * * *."

The once majority rule that a hospital could not be liable under the doctrine of *respondeat superior* for the negligence of physicians who practice within its walls was attributable to the notion that physicians, because of their

---

[6] We find persuasive the United States' Supreme Court's interpretation of "instrumentality" under the Federal Tort Claims Act. In *United States v. Orleans*, 425 US 807, 96 S Ct 1971, 48 L Ed 2d 390 (1976), the court stated that the government's power to supervise the day-to-day operations of the unit in question was a critical element. The receipt of federal money and mandatory compliance with federal standards and regulations were not. 425 US at 815.

skill and training in a highly technical field, are not properly subject to control by hospital lay boards. Hospitals were seen as mere providers of facilities where physicians practiced their profession. *See, e.g., Scloendorff v. Society of NY Hosp.,* 211 NY 125, 105 NE 92 (1914). The "professional skill" immunity trend was reversed, however, in *Bing v. Thunig,* 2 NY2d 656, 666, 163 NYS2d 3, 143 NE2d 3 (1957), where the New York court held that hospitals themselves purport to render care and treatment through their facilities and employes:

> "The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility."[7]

The California court, much earlier than the New York court in *Bing,* applied the doctrine of *respondeat superior* to the hospital-physician relationship where (1) the patient sought treatment from the hospital, not from a particular doctor, and (2) the hospital paid the doctor a salary. *Brown v. La Societe Francaise de Bienfaisance Mutuelle,* 138 Cal 475, 71 P 516 (1903). However, the *Brown* formula is particularly unsatisfactory with respect to the salary requirement. In offering emergency room services, a hospital is offering more than a place. When an injured person seeks such services, we can see no principled reason for allowing the patient to sue the hospital when the doctor is salaried by the hospital, but prohibiting such a

---

[7] In *Guisti v. Weston Co.,* 165 Or 525, 108 P2d 1010 (1941), "professional skill" immunity was also rejected as a basis for holding a hospital blameless where the hospital had contracted to provide medical services to a high school which plaintiff attended.

suit when the doctor is not salaried.[8] *See Schagrin v. Wilmington Medical Center,* 304 A2d 61 (Del Super Ct 1973).

Thus, although the fact that Dr. Hoppert was salaried by the medical school and not by Emanuel is perhaps some evidence that he was not the agent of the hospital, it does not *as a matter of law* determine that he was not. As the orthopedic resident available for emergency room services, he was arguably acting as an agent in performing "an inherent function of the hospital, a function without which the hospital could not properly achieve its purpose." *Beeck v. Tucson General Hospital,* 18 Ariz App 165, 500 P2d 1153 (1972). Unless the evidence allows but one inference, the question of agency is one of fact for the jury. *Clark v. Shea,* 130 Or 195, 201, 279 P 539 (1929).

Moreover, a jury could have found him an "ostensible," if not actual, agent of Emanuel. The rule of apparent agency is set forth in Restatement (Second) Agency § 267 P 578 (1958):

> "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."

Comment a to that section says that, while

> "[t]he mere fact that acts are done by one whom the injured party believes to be the defendant's servant is not sufficient to cause the apparent master to be liable, * * * [t]he rule normally applies where the plaintiff has submitted himself to the care or protection of an apparent servant in response to an invitation from the defendant to enter into such relations with such servant."

Although it cannot reasonably be said that Emanuel literally *invited* plaintiff to utilize the services of the house officers for which it had contracted, it had nevertheless undertaken to provide emergency treatment to the community. An express invitation was not required.

---

[8] Our view does not conflict with the result reached in *Holland v. Eugene Hospital et al,* 127 Or 256, 270 P 784 (1928). There, the hospital's motion for nonsuit was granted because plaintiff *contracted directly* for the services of the *physician,* and there was no evidence of any contractual relationship between the hospital and the physician.

There is nothing in the record to show that plaintiff should have been on notice that Dr. Hoppert was *not* an employee of Emanuel. Certainly, it would be unreasonable to require that an emergency room patient ask whether the doctors attending him in the emergency room are employees of the hospital. *See Seneris v. Haas,* 45 Cal 2d 811, 291 P2d 915 (1955). It would be even more unreasonable to require that he determine whether they are employees of the hospital or of the state. The latter would be particularly untenable, given the different procedural requirements when the defendant is a public rather than a private entity. As in *Adamski v. Tacoma General Hospital,* 20 Wash App 98, 579 P2d 970, 979 (1978),

> "In the instant case, a jury could find that [the hospital] held itself out as providing emergency care services to the public. A jury could find that plaintiff reasonably believed [the attending doctor] was employed by the hospital to deliver that emergency room service. It appears plaintiff was not advised to the contrary and, in fact, he believed he was being treated by the hospital's agent."

Viewing the facts and the inferences therefrom in the light most favorable to plaintiff, *Seeborg v. General Motors Corp., supra,* a jury could find that Dr. Hoppert was "held out" as an employee of Emanuel. That is an issue of fact for trial.

Reversed and remanded.