Opal KELLER, Plaintiff/Appellant,

v.

MISSOURI BAPTIST HOSPITAL OF SULLIVAN; Spectrum Emergency Care, Inc.; et al., Defendants/Respondents.

No. 57788.

Missouri Court of Appeals,
Eastern District,
Division One.

Oct. 16, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied
Dec. 5, 1990.

Application to Transfer Denied
Jan. 9, 1991.

Larry Glenn, St. Louis, for plaintiff/appellant.

Mark E. Goodman, Richard Greenberg, Clayton, for defendants/respondents.

GRIMM, Judge.

In this wrongful death medical malpractice case, plaintiff Opal Keller appeals the summary judgment granted Spectrum Emergency Care, Inc. We reverse and remand.

### I. Background

Spectrum contracted with Missouri Baptist Hospital of Sullivan to provide it with emergency room physicians. A physician provided by Spectrum treated plaintiff's husband. The husband died in March, 1988, and the petition alleges his death was caused by physician's negligence.

Spectrum filed a motion for summary judgment. It contended the physician was not its employee, it did not exercise any control over the physician, and the physician was an independent contractor. Spectrum argued since plaintiff did not allege Spectrum "committed any independent act of negligence, Plaintiff's petition fails to state a claim upon which relief can be granted, and there is no genuine issue as to any material fact."

The trial court's order said it was persuaded "that Defendant Spectrum maintained sufficient control over [the physician] to be liable vicariously." The court, however, relying on *Brown v. Coastal Emergency Services Inc.*, 181 Ga.App. 893, 354 S.E.2d 632 (1987), sustained the motion.

On appeal, plaintiff contends the trial court erred "because the facts demonstrate Spectrum's control of [the physician] sufficient to make Spectrum vicariously liable for the tortious acts of [the physician]." We reverse and remand because there is

sufficient evidence to raise a material question of fact as to whether the physician was Spectrum's employee, thereby making Spectrum vicariously liable.

## II. Spectrum–Physician Agreement

Two agreements were attached to Spectrum's summary judgment motion. One is titled "Independent Contractor Physician Agreement;" it is dated March 15, 1986, and is between Spectrum and the physician. The other is titled "Agreement;" it is dated February 1, 1987, and is between Spectrum and hospital.

We look first at the Spectrum-physician agreement. Although this agreement predates the Spectrum-hospital agreement by about a year, it says that Spectrum "has contracted with [hospital] and with other hospitals" to provide physicians for emergency department coverage. Thus, it appears that Spectrum and hospital's contractual relationship is of long duration.

We note other pertinent provisions. Physician is required to work "no less than an average of 48 hours per week" at the hospital. Spectrum agrees to offer the doctor another 12 hours of work at "other hospitals in Missouri." Physician agrees to coordinate his work hours with the hours of the other emergency room physicians.

Physician also agrees to follow the hospital's "established standards and policies for providing good patient care." Additionally, physician is required to "respond, if possible, to in-house [emergency] codes" and "requests by nursing services and/or staff physicians for assessments of critical in-house patients."

Spectrum agrees to pay physician a "fee" of $24.60 per hour for physician's work at the hospital. If physician works at other hospitals, the fee will "be the prevailing full-time hourly rate at the facility where the Physician is providing coverage." Spectrum agrees to pay physician monthly.

Spectrum agrees to include the physician under its professional liability insurance coverage. In return, physician authorizes Spectrum to deduct forty cents per hour from his fee. The insurance limits are six million dollars per occurrence, fourteen million dollars in the aggregate annually "or such other limits of coverage as may be deemed appropriate by [Spectrum] or as may be required by [Spectrum] or any institution under contract with [Spectrum] and at which Physician renders service." Physician agrees to comply with Spectrum's insurance company's underwriting rules and risk management guidelines.

Spectrum agrees to reimburse physician ten dollars per credit hour for continuing medical education courses. Reimbursement is limited to six hundred dollars per year.

Physician agrees the hospital will do all billing. Physician will "charge the patient in accordance with the current fee schedule." If physician receives any payment from a patient, the payment is to be turned over to the hospital.

Physician agrees not to disclose Spectrum's "confidential methods of operation and trade secrets." Physician also agrees not to "compete with [Spectrum] at assigned hospitals or enter into any contractual arrangements for the provision of emergency department physician coverage with any hospital where Physician has been scheduled by [Spectrum]."

The Spectrum-physician agreement is for one year and is to be "automatically renewed for successive one (1) year terms thereafter," unless either party gives written notice.

The termination provisions entitle Spectrum to terminate its agreement with physician if "any assigned hospital does not grant Physician medical staff privileges or subsequently withdraws such medical staff privileges...." Spectrum may terminate its agreement with physician if any agreement between Spectrum and any assigned hospital is terminated.

The agreement stated the "relationship between [Spectrum] and Physician ... shall be that of independent contractor. [Spectrum] shall not exercise control of any nature, kind or description, relating to the manner or means in which Physician performs medical services or decisions in the

emergency department. Physician shall be responsible for his own actions and shall be subject to the application of the Bylaws, Rules, and Regulations of the medical staff of the hospital where he is working."

## III. Spectrum–Hospital Agreement

We turn now to the Spectrum-hospital agreement. Spectrum agrees to provide physicians for hospital's emergency room twenty-four hours a day, seven days a week, three hundred sixty-five days per year.

One of the doctors provided by Spectrum is to be "chief spokesman" and "Medical Director of the Emergency Department." The contract spells out with some specificity the duties of the director.

The hospital is to be responsible for billing all patients treated in the emergency room. The hospital agrees to pay Spectrum $33.00 per hour for each hour covered by a physician provided by Spectrum. The rate is to increase to $34.00 dollars per hour in 1988 and $35.00 per hour in 1989. The hospital agrees not to employ any physician provided by Spectrum for one year following the termination of the agreement. The agreement contains a liquidated damages provision for breach of the non-solicitation agreement.

The contract contains termination provisions. Spectrum is required to provide physicians who meet the hospital's "established standards and policies for providing good patient care." The hospital has the right to determine whether an individual physician is unqualified; however, the hospital's remedy lies in terminating its contract with Spectrum, not in terminating the physician.

Spectrum agrees to carry professional liability insurance with limits of not less than six million dollars per occurrence and twelve million dollars in the aggregate annually. Spectrum further warrants that each physician will be covered under Spectrum's insurance or would carry individual insurance of at least six million dollars per occurrence.

The agreement also says "all physicians provided ... will be considered independent contractors and practitioners of medicine. In no way shall [Spectrum] be considered or deemed to be engaged in the practice of medicine. [Spectrum] shall not exercise control of any nature, kind or description, relating to the manner or means in which the physicians perform their duties and provide emergency department coverage nor shall Hospital exercise control or discretion over such practice of medicine. Physicians ... shall be responsible for their own actions and shall be subject to the application of the Bylaws, Rules and Regulations of the Medical Staff of the Hospital."

## IV. Parties Relationship

█ In reviewing the grant of summary judgment, we view the record in the light most favorable to the party against whom judgment is rendered. *Fisher v. Scott & Fetzer Co.*, 664 S.W.2d 662 (Mo.App.W.D. 1984). Before reviewing the record, however, we turn to the applicable law.

Physicians must be free to exercise independent medical judgment. Such independence, however, does not preclude a physician from being an employee. In discussing the relationship between a physician and a hospital, this court said: "Liability premised on the theory of respondeat superior does not require plaintiff to prove the employer had actual control over its employee's discretionary judgment as long as the employee's conduct is within the scope and course of employment." *Brickner v. Normandy Osteopathic Hosp.*, 746 S.W.2d 108, 115 (Mo.App.E.D.1988) (Citations omitted).

This court has held hospitals vicariously liable for physicians' acts when the physicians are employees of the hospital. *Id.* See also *Eichelberger v. Barnes Hosp.*, 655 S.W.2d 699, 706 (Mo.App.E.D.1983). Other courts have acknowledged "that application of hornbook rules of agency to the hospital-physician relationship usually leads to unrealistic and unsatisfactory results, at least from the standpoint of the injured patient. Consequently, we have seen a substantial body of special law emerging in this area;

the result has been an expansion of hospital liability for negligent medical acts committed on its premises." *Adamski v. Tacoma General Hosp.*, 20 Wash.App. 98, 579 P.2d 970, 974 (1978).

Courts have focused on factors which reflect the reality of modern employment arrangements. They "appear to show the greatest reluctance to regard the physician as an agent of the hospital ... where the relationship between the physician and the patient was established prior to and independent of any involvement of the hospital." Annotation, *Liability of Hospital or Sanitarium for Negligence of Physician or Surgeon*, 51 A.L.R.4th 235, 246 (1987).

■ Here, the relationship in question is not between the hospital and the physician; it is between a corporation and physician. The corporation, Spectrum, acknowledges in the Spectrum-hospital contract that it is "engaged in the business of providing licensed, qualified and experienced physicians for the rendition of emergency care." We find the situation here analogous to the situation where a hospital directly employs physicians.

The Restatement (Second) of Agency, § 220(2) (1958), sets out these factors to aid in "determining whether one acting for another is a servant or an independent contractor:

 (a) the extent of control which, by the agreement, the master may exercise over the details of the work;

 (b) whether or not the one employed is engaged in a distinct occupation or business;

 (c) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

 (d) the skill required in the particular occupation;

 (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

 (f) the length of time for which the person is employed;

 (g) the method of payment, whether by the time or by the job;

 (h) whether or not the work is a part of the regular business of the employer;

 (i) whether or not the parties believe they are creating the relation of master and servant; and

 (j) whether the principal is or is not in business."

The following evidence supports finding an employer-employee relationship between Spectrum and physician. First, we bear in mind that courts have found an employer-employee relationship even when physicians retain their independent medical judgment. "[T]he control or right to control needed to establish the relation of master and servant may be very attenuated. In some types of cases which involve persons customarily considered as servants, there may even be an understanding that the employer shall not exercise control." Restatement, *supra*, § 220 comment d. Even so, Spectrum maintained some control over physician by requiring him to respond to in-house codes and requests of hospital's staff to assess critical in-house patients.

Second, in the Spectrum-physician contract, physician agreed not to compete with Spectrum by working for a hospital which had contracted with Spectrum. This noncompete clause indicates physician is not "engaged in a distinct occupation or business". Restatement, *supra*, § 220(2)(b).

Third, the parties contemplated a long term relationship. The contract was for one year and renewed automatically. "If the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him." Restatement, *supra*, § 220 comment j.

Fourth, Spectrum paid physician a fixed, hourly rate. Physician was paid the same amount if he saw one patient or one hun-

dred patients. See *Gilstrap v. Osteopathic Sanatorium Co.*, 24 S.W.2d 249, 255 (Mo. App.W.D.1929). In return for his salary, doctor was required to work for the hospital at least 48 hours per week. See *Brickner*, 746 S.W.2d at 112. (Hospital found vicariously liable for resident in emergency room where hospital required resident to work specified hours.) "The relation of master and servant is indicated by the following factors ... payment by hour or month; employment over a considerable period of time with regular hours; full time employment by one employer; employment in a specific area ...; the fact that the work is part of the regular business of the employer." Restatement, *supra*, § 220 comment h.

Fifth, according to both agreements, Spectrum retained the right to terminate physician. If hospital was dissatisfied with physician, hospital's remedy was to terminate its contract with Spectrum. "Closely allied to the power of control is the ability to *enforce* orders in regard to the manner of performance, usually the right to fire the employee...." *Coble v. Economy Forms Corp.*, 304 S.W.2d 47, 52 (Mo.App.S. D.1957) (emphasis original).

Finally, the fact that Spectrum undertook to insure physician indicates physician's work was part of the regular business of employer. When all these factors are considered together, they are sufficient to raise a question of material fact as to Spectrum's vicarious liability.

We have one final comment. The trial court relied on *Brown v. Coastal Emergency Services, Inc.*, 181 Ga.App. 893, 354 S.E.2d 632 (1987) to support the grant of summary judgment. We find that case distinguishable. In *Brown*, the physicians could not be required to work on specific dates; here, the Spectrum-physician agreement does not give physician that prerogative. *Id.* at 635. In *Brown*, the physicians could not be required to work any minimum number of hours per month; here, physician agreed to work no less than an average of 48 hours per week. *Id.*

The order sustaining Spectrum's motion for summary judgment is reversed, and the cause is remanded.

PUDLOWSKI, P.J., and KAROHL, J., concur.